UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

SYMPHONY FS LIMITED,                    :
                                        :
                    Plaintiff,          :
            v.                          :        No. 5:18-cv-3904
                                        :
J. BARRY THOMPSON,                      :
                                        :
                    Defendant.          :
_____

**O P I N I O N**
**Plaintiff's Motion for a Preliminary Injunction, ECF. No. 3—Denied**

**Joseph F. Leeson, Jr.**                          **December 20, 2018**
**United States District Judge**

I.      **INTRODUCTION**

This case results from a failed attempt to purchase bitcoins.[1] Plaintiff Symphony FS

Limited is an Irish company that trades in digital assets and cryptocurrencies. Defendant J. Barry

Thompson operates a business under the name Volantis Escrow Platform LLC, which offers

"technology, escrow and compliance services" related to cryptocurrency transactions.

_____

[1]     Bitcoin is the most prominent example of cryptocurrency, an electronic form of currency
with no tangible format. Bitcoin grew out of an October 2008 whitepaper published by an
unknown person—or group—under the alias Satoshi Nakamoto. The Bitcoin network
(distinguished from the lowercase bitcoin, referring to one unit of the cryptocurrency), operates
using blockchain technology, a shared public ledger reinforced by cryptography which records
all confirmed transactions. Bitcoins are stored in "digital wallets," similar to virtual bank
accounts, that allow users to send or receive bitcoins. Bitcoin wallets keep a secret piece of data
called a private key or seed, which is used to sign transactions. This signature both prevents the
transaction from being altered once it has occurred and allows the transacting parties to remain
anonymous, as only the signatures are recorded in the public log. *See generally How does
Bitcoin work?*, BITCOIN.ORG, https://bitcoin.org/en/how-it-works; Tal Yellin, Dominic Aratari,
and Jose Pagliery, *What is bitcoin?*, CNN MONEY, (December 2013, updated August 8, 2018),
https://money.cnn.com/infographic/technology/what-is-bitcoin/index.html.

Symphony wired €3,600,000 (over $4,100,000) into Volantis's escrow account to fund Thompson's acquisition of bitcoins for Symphony. Thompson allegedly bought 500 bitcoins for Symphony; however, he never transferred them to Symphony or refunded any money placed in escrow. Symphony believes that Thompson used the balance of the escrow funds to try to buy bitcoins for himself; Thompson claims that the funds were stolen by the third-party intermediary he had retained for the transaction.

Symphony filed an arbitration action for breach of contract against Volantis seeking to recover under the terms of the purchase agreement. However, Symphony ran a search for Volantis with the Delaware Secretary of State, found no record of its existence as a Delaware LLC, and concluded that it is a sham. Symphony sued Thompson in this court, bringing claims of unjust enrichment, constructive trust, conversion, breach of fiduciary duty, and fraud.[2] With its complaint, it filed a motion for a temporary restraining order and preliminary injunction to freeze Thompson's assets and prevent him from dissipating funds.

This Court held a hearing on Symphony's request for an injunction on October 29, 2018. Because this Court concludes that Symphony has not demonstrated that it is likely to succeed on the merits of any equitable claim against Thompson, the request for a preliminary injunction is denied.

---

[2]     Throughout this opinion, this Court uses "Thompson" and "Volantis" interchangeably, depending on the context. The use of both names is a matter of convenience only and should not be interpreted as a ruling by this Court on whether Volantis exists as a valid entity, whether Thompson can be held personally liable for actions by Volantis, or any other matter.

## II.    FINDINGS OF FACT[3]

### A.  Symphony and Volantis

1.      Plaintiff Symphony FS Limited is a privately-held investment firm based in Dublin, Ireland. (Pl. Ex. 20, ¶ 2).[4] Its business model involves trading cryptocurrencies, such as bitcoin, and operating as a financial technology business incubator and service provider. (*Id.*). Graham Keating is Symphony's Chief Executive Officer. (Pl. Ex. 20 ¶ 1; Hearing Trans. 30:25-31:5). Jason Dean is Symphony's Chief Operating Officer and Managing Director. (Pl. Ex. 17 ¶ 1, Hearing Trans. 44:19-44:24).

2.      Defendant J. Barry Thompson is the Managing Director of Volantis Escrow Platform LLC and FTL Holding LLC. (Def. Ex. 1; Def. Ex. 30). Volantis is a global escrow and trade facilitation platform that focuses on bitcoin escrow services. (Pl. Ex. 1; Pl. Ex. 27, Nolan Dep. 5:6-5:16). Leland Nolan is the secretary of Volantis and FTL Holding. (Pl. Ex. 27, Nolan Dep. 41:10-41:12; Def. Ex. 1; Def. Ex. 30).

3.      Thompson advertised Volantis as an escrow service company that would: (1) hold assets in escrow within segmented customer accounts; (2) execute transactions on behalf of its customers; and (3) act as an asset custodian for both sides of a transaction, thereby eliminating the risk of default. (Pl. Ex. 1).

---

[3]      "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action," Fed. R. Civ. P. 52(a)(2), which requires the court to "find the facts specially and state its conclusions of law separately," Fed. R. Civ. P. 52(a)(1). While "Rule 52 does not require hyper-literal adherence," findings of fact and conclusions of law must be delineated in such a manner that does not leave an appellate court "unable to discern what were [the court's] intended factual findings." *See In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 197 (3d Cir. 2013); *see also* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2579 (3d ed. 2008) ("The district court should state separately its findings of fact and conclusions of law without commingling them . . . .").

[4]      All citations to exhibits refer to the parties' exhibits from the hearing.

4.     In his dealings with Symphony, Thompson represented Volantis as "a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware." (Pl. Ex. 13, ¶ 4(a)). Thompson states that Volantis is a Series LLC, a specific form of entity under Delaware law, which exists under the umbrella of FTL Holding. (Def. Ex. 3, 4).

5.     Thompson has proffered two Operating Agreements for FTL Holding that include "Separate Series Agreements" for Volantis, one dated August 16, 2018, and one dated July 25, 2017. (Def. Exs. 1, 30).

6.     In the aftermath of the failed transaction, Symphony investigated Volantis and the State of Delaware certified that "Volantis Escrow Platform LLC" was not the name of a Delaware Limited Liability Company. (Complaint, Ex. A, ECF No. 1).

7.     Defendant's witness, John L. Williams, offered as an expert on the Series LLC corporate form under Delaware law, explained that a Delaware Series LLC requires the filing of a Certificate of Formation with the Delaware Secretary of State for only one entity; designating that entity as a Series LLC in its Certificate of Formation allows the members of the LLC to establish one or more series through private operating agreements. (Def. Ex. 12).[5]

**B. The Parties Meet**

8.     In March 2018, Richard Preston introduced Symphony to Thompson and Volantis. (Pl. Ex. 23, Keating Dep. 80:16-80:23). At the time Symphony was searching for an escrow agent to use in connection with purchasing bitcoins. (Pl. Ex. 20 ¶ 3).

---

[5]     Symphony objected to Williams' affidavit at the hearing, but this Court overruled the objection. Symphony's motion in limine to reject Williams's affidavit, ECF No. 42, is therefore denied as well.

9.      Preston works as an introducer of buyers and sellers of bitcoins. (Hearing Trans. 41:18-42:5). He operates on a commission basis and does not receive anything until after a deal between the parties he has introduced completes. (*Id.*).

10.     Preston has never been an employee of Symphony. Nor has Preston ever had the authority to enter into any agreements on behalf of Symphony. (Hearing Trans. 42:6-42:10; 153:8-153:23).

11.     Keating specifically told Thompson in May 2018 that Preston was not a director, shareholder, or an authorized signatory of Symphony. (Hearing Trans. 153:8-153:23). Further, on July 12, 2018, when Keating and Thompson began discussing a potential transaction, Keating specifically told Thompson in a text message that he was the only authorized signatory for Symphony. (Pl. Ex. 8, p. 4).

12.     Between March and July 2018, Keating spoke directly with Thompson on multiple occasions about dozens of potential bitcoin transactions. (Pl. Ex. 20 ¶¶ 3-4). Keating stressed to Thompson that Symphony would only engage in purchases involving Volantis as an escrow agent if Thompson knew the seller and verified before the transaction that Volantis held the seller's coins in escrow. (*Id.*). During this period, Thompson warned Keating and Symphony off of several potential transactions involving Volantis because Thompson did not yet hold the seller's bitcoin in escrow. (*Id.* ¶ 5).

**C.  The Escrow Services Agreement**

13.     Around July 13, 2018, Keating was informed of a potential transaction where Symphony could buy several thousand bitcoins from a seller that intended to use Volantis as the escrow agent. (Pl. Ex. 20 ¶ 6).

14.     On or about July 14, 2018, Keating and Thompson spoke by phone about a potential transaction. (*Id.*). Thompson told Keating that he knew the seller of the coin from prior successful transactions and Thompson had already seen and tested the coin for sale. (*Id.*). Keating and Thompson negotiated a structure for a proposed transaction between Symphony and Volantis. (Pl. Ex. 20, Keating Decl. ¶ 8).

15.     Symphony's compliance team reviewed Volantis's "Know Your Customer" ("KYC") information that Thompson provided Symphony in May and July 2018. (Pl. Ex. 1; Pl. Ex. 23, Keating Dep. 86:8-87:22). Symphony's review of Volantis's KYC information revealed nothing negative about Volantis or Thompson. (Hearing Trans. 34:10-35:13). Symphony also performed a background check on Thompson. The background check revealed nothing negative. (Hearing Trans. 37:3-37:11).

16.     Symphony and Volantis signed an Escrow Services Agreement ("ESA") on July 18, 2018. (Pl. Ex. 13). In the ESA, Volantis agreed to provide "Escrow Services," meaning that Volantis would hold and exchange assets for Symphony, including converting fiat currency[6] into cryptocurrency. (Pl. Ex. 13 ¶ 1(a)). The ESA provides that Symphony may submit a Customer Order to convert any held asset from fiat currency to cryptocurrency. (Pl. Ex. 13 ¶ 1(b)(i)).

17.     The ESA specifically provides that "[Symphony] agrees, understands, and acknowledges that [Volantis] engages in the bilateral purchase and sale of cryptocurrencies" and "if [Symphony] transacts with [Volantis] it does so solely on a bilateral basis[.]" (Pl. Ex. 13 ¶ 4(g)).

---

[6]     "Fiat currency" is defined as "currencies issued by the Treasury of an established government. e.g. US Dollars, Euros, British Pounds, etc." (Pl. Ex. 13, ¶ 2(e)).

18.     Keating understood the agreement to mean that Symphony would purchase the bitcoins directly from Volantis, not the original seller. (Pl. Ex. 20, Keating Decl. ¶ 8). Keating also believed that under the ESA, Symphony and Volantis would transact only with each other and not any other party. (Pl. Ex. 23, Keating Dep. 99:1-99:7). Thompson understood the ESA as contemplating only two parties carrying out the transaction, *i.e.* that Symphony and Volantis would work with each other. (Pl. Ex. 24, Thompson Dep. 170:13-172:3).

19.     The ESA also states that the ESA "and each Customer Order . . . contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, written or oral, among the Parties with respect thereto." (Pl. Ex. 13, ¶ 12).

**D.  The Block Purchase Order of July 24, 2018**

20.     On July 23, 2018, Keating asked Thompson to demonstrate that Volantis possessed the bitcoins that Symphony wanted to buy; at 9:40 a.m. the next day, Thompson sent Keating an email with the address of the wallet containing the bitcoins, stating "[t]his is the source validated with control by the seller." (Pl. Ex. 3; Ex. 20 ¶¶ 10-11).

21.     Keating performed Symphony's standard due diligence on the bitcoins and confirmed that the wallet address Thompson provided contained 10,000 "miner" bitcoins—that is, bitcoins that had never previously been used in a transaction. (Pl. Ex. 23, Keating Dep. 125:7-125:17).

22.     Based upon his conversation with Thompson and the subsequent email that Thompson provided, Keating signed a Block Purchase Order on behalf of Symphony. (Pl. Ex. 20, ¶ 12; Pl. Ex. 4). The Block Purchase Order provided that Symphony would purchase up to 6,600 bitcoins in tranches over eleven days. (Pl. Ex. 4).

23.     In the section entitled "Special Capital Instructions" the Block Purchase Order stated "[t]his transaction is a multi-escrow execution managed by Volantis. All processes fit within the process structure outlined above." (Pl. Ex. 4). Symphony understood the "Special Capital Instructions" to mean that the multiple transactions over the eleven-day period would collectively require multiple escrows involving its escrow agent, Volantis. (Hearing Trans. 47:9-47:15; Pl. Ex. 23, Keating Dep. 108:17-108:25).

24.     Keating believed that the transaction would proceed as follows: (1) Volantis/Thompson would take the seller's bitcoin offline and into "cold storage";[7] (2) Symphony would transfer the funds for an initial tranche of 500 bitcoins to be held in escrow at Volantis; (3) following receipt of Symphony's funds, Volantis/Thompson would load 500 bitcoins from cold storage to a "hot wallet" (*i.e.* an online wallet from which to transfer to Symphony); (4) Volantis/Thompson would transfer 500 bitcoins to Symphony; and (5) then Volantis/Thompson would release Symphony's funds from escrow. (Hearing Trans. 48:1-48:20).

25.     Following the execution of the Block Purchase Order, Symphony transferred €3,600,000 to Volantis on July 24, 2018. (Pl. Ex. 15). On July 25, 2018, Thompson confirmed Volantis's receipt of €3,600,000 from Symphony. (Pl. Ex. 16).

**E.  The Failed July 27 Transaction**

26.     On the morning of July 27, 2018, Keating spoke with Thompson by telephone to finalize the sale price for the initial 500-bitcoin tranche. (Pl. Ex. 20, ¶ 16). After agreeing to a price of €3,303,500, Keating gave Thompson the go-ahead to begin the transaction. (Pl. Ex. 6; Pl. Ex. 20, ¶¶ 16-17).

---

[7]     Symphony used the term "cold storage" to mean taking the wallet from an external party and holding it offline at Volantis. Hearing Trans. 65:15-17.

27.     Symphony believed that Thompson would transfer 500 bitcoins from Volantis cold storage to a Volantis hot wallet, transfer 500 bitcoins from a Volantis hot wallet to Symphony's wallet, and then release the €3,303,500 from escrow. (Hearing Trans. 48.1-48.8; 65:5-65:22). Symphony expected the transaction to close on July 27, 2018. (Pl. Ex. 20, ¶ 17). However, the transaction did not close on July 27; in fact, the transaction has never closed.

28.     Thompson attempted to complete the purchase as a multi-escrow transaction. Unlike a single-escrow transaction, where the buyer and seller transact through a single escrow agent, a multi-escrow, or double-escrow, transaction involves two escrow agents: one accepts the purchase money from the buyer and the other accepts the bitcoins from the seller. (Hearing Trans. 95). Once the parties establish control over the assets and verify that they have been transferred, the escrow agents distribute the assets. (*Id.*).[8]

29.     Thompson claims that on July 27, he sent $4,024,914.56 from Volantis to KRFB Global Group, LLC, the second escrow agent used by Volantis to purchase 544 bitcoins from a seller, True North Brands, LLC. (Def. Ex. 7, ¶¶ 20, 69). Approximately 92 percent of the sum sent to KRFB was from the €3,600,000 that Symphony had transferred to Volantis to hold in escrow. (Pl. Ex. 24, Thompson Dep. 156:14-156:21; Hearing Trans. 86:8-86:14).

30.     Thompson claims that the transaction never closed because True North absconded with the funds, with the assistance of others. (Def. Ex. 7).

---

[8]     Thompson explained that multi-escrow transactions are attractive because they allow bitcoins to be bought at higher discounts (in this case, six percent) than single-escrow transactions. These significant discounts are offered by entities that mine the bitcoins, or earn them by hosting the computer networks on which the Bitcoin market operates; however, these entities have "significant criteria" to protect against money laundering and other risks. These criteria include the use of an escrow agent that the seller controls. (Hearing Trans. 94-95).

31.     Both Symphony and Thompson understand "operational control" to mean the ability to transfer bitcoin from one wallet to another, or here, from Volantis to Symphony. (Hearing Trans. 65:5-65:22; Pl. Ex. 24, Thompson Dep. 26:7-26:23). Before the July 27 Trade, Symphony believed that Thompson had operational control over the bitcoins that Symphony intended to purchase from Volantis. (Hearing Trans. 64:23-64:2; 67:4-67:7). Thompson admitted that he never had full operational control over the bitcoins that Volantis had promised to sell to Symphony. (Pl. Ex. 24, Thompson Dep. 27:7-27:23).

32.     Before the failed July 27 trade, Symphony had never participated in a double-escrow transaction. (Hearing Trans. 152:6-152:22).

33.     Thompson described multi-escrow transactions as "fraught with risk." Of the hundreds of transactions Volantis has performed, only five have been multi-escrow—two of which, including the July 27 trade—failed. (Hearing Trans. 95-96).

34.     Symphony claims that it would not have entered into the ESA, Block Purchase Order, or the July 27 trade if it had known that Thompson did not have operational control over the bitcoins or that he planned to send Symphony's funds to a third party without having operational control over the bitcoins. (Pl. Ex. 20, ¶ 11; Hearing Trans. 152:2-152:5).

**F. The Parties' Communications After the Failed Transaction**

35.     On July 27, 2018, when Symphony's bitcoin purchase did not close, Keating asked Thompson for an update. (Pl. Ex. 20 ¶ 17; Pl Ex. 8, p. 11). Thompson informed him by text message that he was calling the "escrow company" and "I'm just finding out if they received the wire. Then I can release." (Pl. Ex. 8, p. 11).

36.     On July 29, 2018, Thompson subsequently told Keating by text message that the "paper is set to clear at 9 am tomorrow[.]". (Pl. Ex. 8, p. 16). That day, Dean spoke to Thompson

by telephone. (Pl. Ex. 7, p. 8). Dean then told Keating that Thompson "indicated to me that the agreement with the Seller is that the coin would be released once funds had cleared on account. As of [close of business] Friday, the funds had not yet cleared on account, but that they would be cleared as of Monday, 9 am New York time, at which time the coin will be released." (*Id.*).

37.     Keating first became aware that the July 27 trade involved a second escrow agent and a multi-signature wallet, such that Thompson did not have operational control over the bitcoins, on July 30, when he learned of an email exchange that day between Thompson and Bart Smets, an intermediary who had worked with Thompson and Preston previously. (Pl. Ex. 5; Pl. Ex. 7, p. 18). Smets, summarizing what Thompson had told him about the transaction, stated that: (1) "The fiat is with KRFB Escrow, the counterparty seller escrow of the seller"; (2) "The coins are in a multi signature wallet under your contractual ownership"; (3) "[I]n order to release the coins, the seller escrow has to co-sign with their key to be able to release the transaction"; and (4) "the counterparty escrow seems to be unable to co-sign for the past 5 hours." (Pl. Ex. 5).

38.     On August 1, 2018, Thompson texted Keating and told him that a demand for the return of Symphony's funds had been made; however, he was skeptical that the seller would comply and stated that the seller "said new coin would be delivered before then (yeah right)." (Pl. Ex. 8, p. 18). That same day, Keating told Thompson by text message that there was to be no discussion with Thompson's seller under "BS double escrow." (Pl. Ex. 7, p. 4).

39.     On August 2, 2018, Thompson informed Keating by text message that he was working with Chase Bank to remove an administrative hold on Symphony's funds and once removed, Chase Bank would return Symphony's funds to Volantis. (Pl. Ex. 8, p. 21).

40.     On August 4, 2018, Keating explicitly stated to Thompson by text message, "Barry, remember we are not facing the seller just you. So all of this double escrow bs is really

your issue . . . Never again is there any convoluted double escrow." (Pl. Ex. 8, p. 25). Thompson responded, "I fully understand." (Pl. Ex. 8, p. 25).

41.     On August 9, 2018, Thompson told Keating by text message that, "[t]hinking I will get coin release this afternoon. I have some one meeting in person with the seller and escrow in 2 hours." (Pl. Ex. 8, p. 29).

42.     On August 14, 2018, Thompson told Keating by text message, "Coin today is looking good . . . they accumulated the 100k coins for the transaction so it should start moving today for that." (Pl. Ex. 8, p. 34).

43.     On August 16, 2018, Keating complained to Thompson that "[a]pparently Bart [Smets] and Richard [Preston] [were] aware of the double escrow but not me[,] Jason [Dean], or my team?" (Pl. Ex. 7, p. 17).

44.     On August 17, 2018, Thompson met Dean in person in Ontario, Canada. (Pl. Ex. 17, ¶ 16). Dean stated that at the August 17 meeting, Thompson told Dean that he had converted the €3,303,500 that Symphony had sent Volantis into dollars and transferred that money to KRFB in his attempt to purchase 500 bitcoins for Symphony. (Pl. Ex. 17, ¶ 17).

45.     Dean claims that at the August 17 meeting, Thompson also told Dean that: (1) during the July 27 Trade he, Thompson, had attempted to purchase 44 bitcoins for himself (Pl. Ex. 17, ¶ 19) and (2) Symphony's 500 bitcoins were being held in a public, multi-signature wallet containing 10,000 bitcoins, which required three cryptographic keys to access. (*Id.* ¶ 21). According to Dean, Thompson was claiming that two keys had been used to access the wallet, but a third key was being held by someone who had not made it available. (*Id.*).

46.     On August 22, 2018, Symphony demanded return of its remaining escrow balance held by Volantis, which Symphony believed was €296,500 (Pl. Ex. 6). Symphony never received the bitcoins or the full refund of their funds.

47.     Volantis filed an action in California on September 5, 2018, against True North and KRFB to recover the missing funds.

## III.    LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without the injunction; (3) the "balance of equities" weighs in the moving party's favor; and (4) the public interest favors the injunction. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The moving party bears the burden of showing that each of these four factors tips in its favor. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) ("The 'failure to establish any element . . . renders a preliminary injunction inappropriate.'" (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999))). A preliminary injunction is an "extraordinary remedy never awarded as a matter of right" that is reserved for "limited circumstances." *See Groupe SEB*, 774 F.3d at 197 (quoting *Winter*, 555 U.S. at 24); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Windback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)) (internal quotation mark omitted).

## IV.    CONCLUSIONS OF LAW

Symphony seeks a preliminary injunction to prevent Thompson from dissipating assets that he could use to satisfy an ultimate judgment in this case. Generally, a federal court has no

authority to freeze a defendant's funds to help ensure satisfaction of a judgment should the plaintiff prevail on an underlying legal claim. *See Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999). A plaintiff may obtain a prejudgment freeze on a defendant's assets only if he satisfies three conditions: (1) he asserts a cognizable equitable claim, (2) he demonstrates a sufficient nexus between that equitable claim and specific assets of the defendant which are the target of the injunctive relief, and (3) he shows that the requested interim relief is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed. *F.T. Int'l, Ltd. v. Mason*, No. CIV.A. 00-5004, 2000 WL 1514881, at *1 (E.D. Pa. Oct. 11, 2000). Additionally, the plaintiff must satisfy the four requirements for injunctive relief outlined above. *Id.*

Symphony's claims for conversion and a constructive trust cannot justify an asset freeze injunction: conversion is a legal claim, not an equitable claim, *F.T. Int'l, Ltd. v. Mason*, 2000 WL 1479819, at *2, and a constructive trust is a remedy, not a cause of action. *Marion v. Benistar, Ltd.*, No. CIV.A. 03-4700, 2005 WL 563698, at *1 (E.D. Pa. Mar. 10, 2005). Symphony's fraud and breach of fiduciary duty claims cannot ground an asset freeze on their own either, because they are legal claims. *F.T. Int'l, Ltd.*, 2000 WL 1479819, at *2 (holding that, although plaintiff would likely prevail on fraud claim, court could not freeze assets because fraud is not an equitable claim); *Com. v. TAP Pharm. Prod., Inc.*, 94 A.3d 350, 355 (Pa. 2014) (listing fraud as a legal, not an equitable claim); *Citizens Bank of Pennsylvania v. Myers*, 872 A.2d 827, 835 n.7 (Pa. Super. Ct. 2005) (holding that breach of fiduciary duty is a legal claim, not an equitable claim). However, this Court discusses the merits of Symphony's fraud and breach of fiduciary duty claims because, as explained below, Symphony's unjust enrichment claim depends in part upon the merits of these legal claims. Symphony presents one equitable cause of

action in support of its request for an asset freeze: unjust enrichment. Because this Court concludes that Symphony has not shown a likelihood of success on its unjust enrichment claim, Symphony's request for injunctive relief fails.

### A. Symphony's request for an injunction fails because it has not shown a likelihood of success on the merits of its unjust enrichment claim.

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir. 1982). In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir. 1975). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice And Procedure § 2948, pp. 129–130 (2d ed. 1995) (footnotes omitted)). Although all four factors of the preliminary injunction test are important, "failure to show either likelihood of success on the merits or irreparable harm must necessarily result in denial of a preliminary injunction." *Cancer Genetics, Inc. v. Hartmayer*, No. CIV. 07-5463(FSH), 2008 WL 323738, at *3 (D.N.J. Feb. 5, 2008) (internal citations and quotations omitted).

Symphony claims that Thompson has been unjustly enriched because his wrongful conduct caused Symphony to transfer the €3,600,000 to him, that Thompson has refused to return the funds and that it would be inequitable to allow him to keep them. To state a claim for unjust enrichment under Pennsylvania law, "a claimant must show that the party against whom

recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'" *Torchia,* 499 A.2d at 582 (quoting *Roman Mosaic & Tile Co. v. Vollrath,* 313 A.2d 305, 307 (Pa. Super. Ct. 1973)); *see also Lampe v. Lampe*, 665 F.3d 506, 520 (3d Cir. 2011) (unjust enrichment requires a benefit conferred on defendant which defendant retained in circumstances that would make it inequitable for defendant to retain it). "In order to recover, there must be *both* (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied." *Torchia,* 499 A.2d at 582–83 (quoting *Samuels v. Hendricks,* 445 A.2d 1273, 1275 (Pa. Super. Ct. 1982)).

Unjust enrichment claims under Pennsylvania law fall into one of two categories: (1) a quasi-contract theory of liability, where the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a "companion" theory of liability, where the unjust enrichment claim is a companion to a tort claim and seeks to divest the defendant of a benefit obtained by committing the tort. *See, e.g., Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010) (dismissing the plaintiff's unjust enrichment claim because (1) the plaintiff did not allege that the defendant refused to provide a service or good after securing a benefit, and (2) the plaintiff did not "plead a separate tort, the damages from which could be supported by a theory of unjust enrichment"); *Torchia*, 499 A.2d at 582 ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." (citation omitted)). Symphony presents arguments under both theories.

### 1. Unjust Enrichment as Quasi-Contract

Under the first theory, unjust enrichment as quasi-contract, an unjust enrichment claim may be pled as an alternative to a breach of contract claim. *Lugo v. Farmers Pride, Inc.*, 967

A.2d 963, 970 (Pa. Super. Ct. 2009). A quasi-contract theory is "typically invoked . . . when [the] plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999). Symphony's allegations suggest a quasi-contract theory: Symphony argues that, because it contends that Volantis is a sham, the ESA was void from the start. Compl. ¶ 13. Therefore, it seeks to recover from Thompson directly the sum that it conferred on him pursuant to the void contract.

However, at the hearing, Thompson presented evidence that Volantis does in fact exist as a legitimate entity, including two separate operating agreements for FTL Holding that include Separate Series Agreements for Volantis, one dated from before the failed July 27 transaction and one dated after it. Thompson's expert Attorney Williams explained why Symphony's search for Volantis did not reveal a registration with the Delaware Secretary of State: Delaware law does not require a separate registration for each series once the first LLC has been formed. If Volantis does exist as a valid entity, then Symphony's quasi-contract unjust enrichment claim fails: quasi-contract unjust enrichment does not apply where a valid written contract exists. *SodexoMAGIC, LLC v. Drexel Univ.*, 333 F. Supp. 3d 426 (E.D. Pa. 2018) (citing *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006)).

Perhaps sensing this conclusion, Symphony has attempted to cast doubt on Thompson's evidence that Volantis is a valid Series LLC. Symphony points out that the digital signatures on the two Separate Series Agreements appear to be identical, that Thompson testified that he created the August 16, 2018 Separate Series Agreement himself, and that Nolan does not recall signing the Separate Series Agreement dated before the July 27 transaction. Symphony contends that these facts raise a "colorable claim" that Thompson fabricated the documentary evidence he

presented to show that Volantis existed prior to the ESA. Pl.'s Findings of Fact and Concl. Law ¶ 54.

Symphony freely admits that "[w]hether Volantis existed before July 2018, and therefore could execute the ESA, is an issue of fact to be determined at trial." Pl.'s Findings of Fact and Concl. Law ¶ 55. This alleged issue of fact defeats Symphony's ability to obtain a preliminary injunction based on a quasi-contract unjust enrichment claim. A party moving for an injunction has not shown a "clear right to relief" when disputed issues of fact remain. *Israel Disc. Bank of New York v. H.N. Int'l Grp., Inc.*, No. CV 16-6258-BRM-LHG, 2016 WL 6023155, at *3 (D.N.J. Oct. 14, 2016). Thus, regardless of the merits of Symphony's argument that Volantis does not exist, it has not shown a clear right to relief on a quasi-contract theory of unjust enrichment: if Volantis does exist, then Symphony's claim fails; if Symphony has placed Volantis's existence in doubt, the dispute of fact precludes injunctive relief. Either way, Symphony has not shown a likelihood of success on the merits of a quasi-contract unjust enrichment claim.

## 2. Unjust Enrichment as a Companion to Tort Claims

With respect to Pennsylvania's second theory of unjust enrichment, an unjust enrichment claim may be pled as a companion, not an alternative, to a tort claim. In that case, the unjust enrichment seeks to recover a benefit the defendant gained by committing the tort. "In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." *Steamfitters*, 171 F.3d at 936.

Perhaps recognizing that it may have concluded too hastily that Volantis is a sham, Symphony has pivoted to state its unjust enrichment claim as a companion to its fraud and breach of fiduciary duty claims. Symphony claims that Thompson accepted and retained

Symphony's funds by committing fraud and breaching his fiduciary duties as Symphony's escrow agent and that it would be unjust to allow him to retain the benefit he received. *See* Pl.'s Findings of Fact and Concl. Law ¶¶ 6, 27. Previous courts have allowed unjust enrichment claims as companions to fraud and breach of fiduciary duty claims. *See Euro Motorcars Germantown, Inc. v. Manheim Remarketing, Inc.*, No. CIV.A. 13-7614, 2015 WL 1057887, at *7 (E.D. Pa. Mar. 4, 2015) ("It is clear that where there is a viable fraud claim, a claim for unjust enrichment may be an appropriate adjunct."); *In re Lampe*, 665 F.3d 506, 520 (3d Cir. 2011) (holding that "a showing of unjust enrichment still may be significant in a case involving a claim of breach of fiduciary duties, particularly when the duty is of loyalty" and finding director was unjustly enriched through breach of fiduciary duty).

Unjust enrichment claims brought as companions to torts rise and fall with the underlying tort claims. *SodexoMAGIC, LLC*, 333 F. Supp. 3d at 473. "[U]nlike the quasi-contract theory of unjust enrichment, which acts as an equitable stand-in for a failed breach of contract claim, an unjust enrichment claim based on wrongful conduct cannot stand alone as a substitute for the failed tort claim." *Id.  See also Euro Motorcars Germantown, Inc.*, 2015 WL 1057887, at *6 (noting that courts do not allow unjust enrichment to expand tort liability where the elements of a tort have not been satisfied). Therefore, to show that it is likely to prevail on the merits of its unjust enrichment claim as a companion to its claims for fraud and breach of fiduciary duty, Symphony must show that it is likely to succeed on the merits of those underlying claims. This Court addresses each in turn and concludes that Symphony has not shown a likelihood of success.

### a. Fraud

Symphony claims that Thompson misrepresented two crucial points concerning the July 27 trade: (1) he falsely stated that he would hold Symphony's funds safely in escrow and did not disclose that he intended to perform a multi-escrow transaction, and (2) falsely stated that he would hold the funds until Volantis had full operational control over the bitcoin and did not disclose that, under the multi-escrow structure of the transaction, he would not have operational control. Symphony claims that these misrepresentations induced it to enter the ESA, execute the July 24 Block Purchase Agreement, and transfer €3.6 million to Volantis.

Symphony's fraud in the inducement claims based on the ESA and the Block Purchase Agreement are likely barred by Pennsylvania's parol evidence rule. In Pennsylvania, "it is now settled" that where there is an integrated contract, "the parol evidence rule bars claims of fraud in the inducement and only allows claims of fraud in the execution." *Agri-Mktg., Inc. v. ProTerra Sols.*, LLC, No. 5:17-CV-00627, 2018 WL 1444167, at *6 (E.D. Pa. Mar. 22, 2018) (citing *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589, 592 (E.D. Pa. 1999)). "Thus, a party may assert that provisions of a written agreement were omitted by fraud, accident or mistake, but not that it was induced to enter a contract by fraudulent misrepresentation." *Id.* This rule "is premised on the principle that if a sophisticated, well-represented party . . . intends to rely on significant representations made prior to the execution of a fully integrated contract, that party can protect itself from fraud or mistake by including those representations in the final written agreement." *Id.*

The ESA contains an integration clause which provides that the ESA "and each Customer Order . . . contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, written or oral, among the Parties with respect thereto." Symphony does not challenge the validity of this integration clause or

assert that any provision was omitted by fraud, accident or mistake. Therefore, Symphony's claims of fraud in the inducement based on the ESA and the Block Purchase Agreement are likely barred by Pennsylvania's parol evidence rule.

To the extent that Symphony claims that Thompson committed fraud by failing to comply with the ESA and engaging in a double-escrow transaction in which he would not have operational control over the subject bitcoins, Symphony states claims for fraud in the performance, which are barred by Pennsylvania's gist of the action doctrine. "[T]he gist of the action doctrine 'is designed to maintain the conceptual distinction between breach of contract claims and tort claims.'" *KBZ Commc'ns Inc. v. CBE Techs. LLC*, 634 Fed. App'x 908, 910 (3d Cir. 2015) (quoting *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). The doctrine bars tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

*Id.* (quoting *eToll*, 811 A.2d at 19). Symphony alleges that Thompson represented that he would hold Symphony's funds safely in escrow until Volantis acquired full operational control over the bitcoins to be purchased. Thompson's alleged obligations to complete a single-escrow transaction and maintain full operational control of the targeted bitcoins before taking any money stem only from Symphony's understanding of the ESA. In their proposed findings of fact and conclusions of law, the parties argue about whether the Block Purchase Order amended the ESA to permit a double-escrow transaction. These arguments highlight that their dispute, at heart, involves a breach of contract. Symphony simply seeks to repackage Thompson's breach of those

contractual obligations as fraud claim. Because Thompson's alleged liability stems from a

contract, the gist of the action doctrine likely bars Symphony's fraud in the performance claims.[9]

Moreover, numerous issues likely prevent Symphony from establishing the elements of

fraud. Under Pennsylvania law, a plaintiff seeking to recover for fraud must establish six

elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely,

with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of

misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the

resulting injury was proximately caused by the reliance. *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa.

1994).

Symphony has not produced evidence of a false representation by Thompson. Symphony

contends that Thompson told Symphony that Volantis would hold Symphony's funds in escrow

until Volantis obtained full operational control over the bitcoins Symphony wanted to buy;

however, Symphony has produced no evidence of any such specific statement by Thompson.

Symphony argues that Thompson's July 24 email to Keating with the wallet address for the

bitcoin Symphony was to purchase suggested that Volantis had operational control of the bitcoin;

---

[9]     Thompson suggests that the economic loss doctrine also defeats Symphony's claims.
Def.'s Findings of Fact and Concl. Law, ECF No. 48, at 17. Although the distinction between the
economic loss doctrine and the gist of the action doctrine is "largely one of pedigree," the Third
Circuit Court of Appeals has noted that the gist of the action doctrine "is a better fit" than the
economic loss doctrine outside of products liability cases. *See Graham Packaging Co., L.P. v.
Transplace Texas, L.P.*, No. 1:15-CV-01186, 2015 WL 8012970, at *2 (M.D. Pa. Dec. 7, 2015)
(citing *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 548 (3d Cir. 2010) and
*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 n.11 (3d Cir. 2001)).
Because Symphony brings no products liability claims, this Court considers only the gist of the
action doctrine. *Id.* (denying motion to dismiss based on economic loss doctrine in non-products-
liability case and considering gist of the action).

however, in the email Thompson explicitly told Keating that "[t]his is the source validated *with control by the seller*." *See* Pl. Ex. 3 (emphasis added). Keating testified at length concerning his own understanding of the transaction: he believed Volantis would take the seller's bitcoin offline and into "cold storage," then Symphony would transfer the funds, and Volantis would transfer the bitcoins into a "hot wallet" for transfer to Symphony. However, Symphony presented no evidence of specific statements by Thompson that led Keating to believe that the transaction would occur as he did.

Nor does Symphony offer any evidence that Thompson misrepresented that the transaction would occur by single escrow. In fact, the evidence suggests that Thompson assumed Symphony knew the transaction would occur by double escrow. In a text message to Thompson on August 16, 2018, Keating recognized that Bart Smets and Richard Preston were aware of the double-escrow structure of the transaction, but complained that Keating, Dean, and their team did not. The next day, Keating told Dean by text that Thompson remained convinced that the parties' agreements provided for double escrow. The Block Purchase Order did indeed describe the purchase as a "multi-escrow execution." *See* Pl. Ex. 4. Although Symphony presented evidence that it understood this provision to mean that the multiple planned transactions would require multiple escrows, it presented no evidence that Thompson told Symphony that was what "multi-escrow" meant, or that Symphony ever communicated its understanding of "multi-escrow execution" to Thompson. Symphony has shown, at most, that it and Thompson had different understandings of how the July 27 transaction would occur, not that Symphony relied on any misrepresentation by Thompson.

Even if Symphony could show an actionable misrepresentation by Thompson, it likely could not establish that it justifiably relied on any misrepresentation. Some evidence suggests

that Symphony may have had reason to know that Thompson contemplated a multi-escrow transaction and would not have immediate operational control of the bitcoins. Most notably, the Block Purchase Agreement explicitly states that "[t]his transaction is a multi-escrow execution managed by Volantis." Keating signed this agreement on behalf of Symphony. Additionally, Thompson's July 24 email in advance of the July 27 transaction recognized that the seller retained control of the bitcoins, indicating that Thompson did not have operational control over the bitcoins as Symphony presumed. Regardless, Symphony gave Thompson the go-ahead for the purchase of the bitcoins.

This Court finds that Symphony has not shown a likelihood of success on its fraud claim; therefore, it has not shown a likelihood of success on an unjust enrichment claim brought as a companion to its fraud claim.

### b. Breach of Fiduciary Duty

Symphony argues that Volantis breached a fiduciary duty as an escrow agent by "releasing Symphony's money under false pretenses and without first having the 500 bitcoins that Symphony sought to purchase under his full operational control" and that Thompson is personally liable as a corporate officer because he participated in and controlled Volantis's breach. Pl.'s Proposed Findings of Fact and Concl. Law ¶¶ 34-35, ECF No. 49.

Symphony states correctly that an escrow agent ordinarily owes fiduciary duties to the depositor of the escrow. *See Frenkel v. Baker*, No. CIV.A. 13-5880, 2014 WL 5697449, at *8 (E.D. Pa. Nov. 4, 2014); *Knoll v. Butler*, 675 A.2d 1308, 1312 (Pa. Commw. Ct. 1996) ("An ordinary escrow agreement creates a fiduciary relationship between the agent and the transferor."), *aff'd*, 693 A.2d 198 (Pa. 1997). These fiduciary duties arise pursuant to the escrow agreement, and courts do not find a breach of fiduciary duty where no valid escrow agreement

exists. *See Janson v. Cozen & O'Connor*, 676 A.2d 242, 248 (Pa. Super. Ct. 1996) (finding no breach of fiduciary duty where no valid escrow agreement was formed). However, as discussed above, Symphony has created a question of fact concerning the existence of Volantis and, consequently, the validity of the ESA. If the ESA was invalid, then no valid escrow agreement arose, and Thompson cannot have breached any fiduciary duty resulting from the ESA.

Moreover, the gist of the action doctrine likely bars Symphony's breach of fiduciary duty claim. "A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations." *Batoff v. Charbonneau*, No. 12-CV-05397, 2013 WL 1124497, at *7 (E.D. Pa. Mar. 19, 2013) (citing *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008)). However, when "'the larger social policies embodied in the law of torts' rather than 'the terms of the contract' are what underlie [a party's] breach of fiduciary duty claim" then the claim is not barred by the gist of the action. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 105 (3d Cir. 2011). In *Bohler–Uddeholm*, the Third Circuit concluded that because plaintiff's breach of fiduciary duty claim rested on the fiduciary duty a majority shareholder owes a minority shareholder in a joint venture and not on the duties detailed in the contract between the two parties, the claim was not barred by the gist of the action. *Id.* at 105.

Symphony insists that the gist of the action doctrine does not bar its fiduciary duty claim because "fiduciary duties imposed on escrow agents by common law are born of general social utility." Pl.'s Proposed Findings of Fact and Concl. Law ¶ 57. However, Symphony does not base its claim on the "larger social policies" underlying the fiduciary duties of escrow agents, but on the specific terms of the ESA. Symphony points out that the ESA requires Volantis to hold

assets for Symphony at Symphony's "discretion and direction" and that Symphony "may instruct" Volantis to exchange assets held between cryptocurrency and fiat currency. Symphony contends that Volantis, through Thompson, violated these provisions by releasing Symphony's money without first having operational control over the bitcoin to be purchased.  In other words, Symphony alleges that Thompson breached his fiduciary duty by violating the ESA: Symphony's claim is grounded in Volantis's contractual obligations. Therefore, the gist of the action doctrine likely bars Symphony's breach of fiduciary duty claim, and Symphony has not shown a likelihood of success on the merits of that claim. As a result, Symphony has not shown a likelihood of success on the merits of its unjust enrichment claim as a companion to breach of fiduciary duty.

### B.  Thompson's Request for a Damages Hearing

Thompson requests a damages hearing in the event of a determination that he was wrongfully enjoined and indicates that he will seek damages in excess of the $1,000,000 bond Symphony posted in support of the temporary restraining order. Fed. R. Civ. P. 65(c) requires an injunction bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The "purpose of the bond requirement is to protect the enjoined party in the event the injunction should not have been imposed." *Howmedica Osteonies Corp. v. Zimmer, Inc.*, et al, Nos. 11–2342 & 11–2343, 2012 WL 477624 at *5 (3d Cir. Feb 15, 2012). Rule 65.1 establishes a procedure for collecting damages on the posted bond.

No liability can arise on an injunction bond unless there is a final judgment in favor of the party enjoined. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. CV 11 1857(DMC)(JAD), 2012 WL 13034222, at *1–2 (D.N.J. Dec. 6, 2012) (quoting *American Bible Soc. v. Blount*, 446

F. 2d 588, 594 (3d Cir. 1971). For damages to be awarded, the enjoined party must establish that they "had a right all along to do what they were enjoined from doing." *Latuszewski v. Valic Fin. Advisors, Inc.*, No. 03–0540, 2007 WL 4462739 (W.D. Pa. Dec. 19, 2007) *aff'd, Latuszewski v. VALIC Fin. Advisors, Inc.*, 393 Fed. App'x. 962 (3d Cir. 2010). Because this case has not resulted in a final judgment or decision on the merits, Thompson's request is premature, and this Court denies it without prejudice for him to renew the request at a later stage.

## V.    CONCLUSION

For the reasons discussed above, Symphony has not shown that it is likely to prevail on any equitable claim; therefore, Symphony has not established that it is entitled to injunctive relief. Symphony's request for a preliminary injunction freezing Thompson's assets is denied. A separate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge